UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-61509-CIV-COHN/SELTZER

AMY S. JACKSON,

       Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

_____/

## REPORT AND RECOMMENDATION TO DISTRICT JUDGE

I.    <u>INTRODUCTION</u>

THIS CAUSE is before the Court on the cross-motions for summary judgment[1] filed,

respectively, by Plaintiff Amy S. Jackson ("Claimant") and by Defendant Michael J. Astrue,

Commissioner of Social Security ("Commissioner"). The motions were referred to the

undersigned pursuant to 28 U.S.C. § 636 and Magistrate Rule 1(c) and (d), Local Rules

of the United States District Court for the Southern District of Florida.

The cross-motions present the following issue: whether there exists substantial

evidence in the record to support the determination of the Administrative Law Judge

("ALJ") that Claimant retains the capacity to return to her past relevant work and, therefore,

that she is "not disabled" within the meaning of the Social Security Act. The undersigned

---

[1] Although other circuits have found the summary judgment device inappropriate
for deciding cases under the Social Security Act, <u>see</u>, <u>e.g.</u>, <u>Igonia v. Califano</u>, 568 F.2d
1383 (D.C. Cir. 1977), this Circuit has deemed it appropriate where the district court has
reviewed the record and based its judgment on a finding of substantial evidence in the
administrative record. <u>See</u> <u>Lovett v. Schweiker</u>, 667 F.2d 1 (5th Cir. 1981).

concludes that substantial evidence does support the ALJ's determination. Accordingly, the undersigned RECOMMENDS that Plaintiff's Motion for Summary Judgment (DE 12) be DENIED, that Defendant's Motion for Summary Judgment (DE 15) be GRANTED, and that the Commissioner's decision be AFFIRMED.

II.     PROCEDURAL HISTORY

On May 27, 2004, Claimant filed applications for a period of Disability, for Disability Insurance Benefits ("DIB"), and for Supplemental Security Income ("SSI"), alleging she became unable to work on February 16, 2004, due to arthritis in her hips, chronic pain, and loss of use of her right hand. Tr. 52-54, 69, 320-325. Claimant later amended her disability onset date to December 15, 2003. Tr. 55, 342-344. The Social Security Administration denied Claimant's applications initially and upon reconsideration. Tr. 37-46, 326-329.

Claimant filed a timely request for hearing, which was held before an ALJ on August 15, 2005. Tr. 339-357. Represented by counsel, Claimant appeared at the hearing and testified. Tr. 339-357. On December 12, 2005, the ALJ issued his decision, finding that Claimant is "not disabled" because she retains the residual functional capacity to return to her past relevant work, as she had described it. Tr. 19-26. On August 29, 2007, the Appeals Council denied Claimant's request for review, leaving the ALJ's decision standing as the final decision of the Commissioner. Tr. 5-8.

On October 22, 2007, Claimant filed a Complaint in this Court seeking judicial review of the Commissioner's decision (DE 1). On January 25, 2008, the Commissioner filed an Answer, together with the administrative record (DE 9, 10). On March 11, 2008,

Claimant filed Plaintiff's Motion for Summary Judgment with Supporting Memorandum of Law (DE 12), and on April 28, 2008, the Commissioner filed Defendant's Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment with Supporting Memorandum of Law (DE 15). Thereafter, Claimant did not respond to the Government's motion or reply to the Government's response, and her time for doing so has now passed. Accordingly, the matter is now ripe for review.

III.   FACTS

The undersigned has reviewed the Statement of Facts contained within Defendant's Motion for Summary Judgment and finds that it fairly and accurately summarizes the relevant portions of the administrative record.[2]

> Plaintiff alleged a date of disability of December 15, 2003, claiming disability due to arthritis in her hips, chronic pain, and loss of use of her right hand (Tr. 55, 69). Medical records before Plaintiff's alleged onset date show that she was treated for rheumatoid arthritis beginning in May 2002 (Tr. 153). She was treated at the North Davis Center for Family Health and by Robert Gay, Jr., M.D., from May 2002 until June 2003 (Tr. 153, 167). Plaintiff reported pain and swelling in her hands (Tr. 153, 171). She also described pain in her hips, knees, ankles, feet, and elbows (Tr. 171, 149, 146). She admitted that her symptoms improved with Medrol dosepaks and Celebrex (Tr. 171, 146, 143, 139). Plaintiff complained of sleepiness and tiredness from her medication and difficulty concentrating (Tr. 143). Dr. Gay noted mild synovitis in her hands but none in her elbows and knees (Tr. 171). She had mild tenderness in her hands, wrists, and ankles (Tr. 171, 149, 145, 143, 141).
>
> In December 2002, Plaintiff's right hand was extremely tender and she began reporting arm and shoulder pain (Tr. 139-138). She indicated that exhaustion caused her to sleep more (Tr.

---

[2] The undersigned has found some slight errors in the Commissioner's Statement of Facts and has bracketed the corrections thereto.

138, 137). Plaintiff stated that her knees, elbows, and hands bothered her (Tr. 137). Her hands were not swollen, red, or tender (Tr. 137). She exhibited an antalgic gait (Tr. 137). Dr. Gay noted in January 2003, that Plaintiff had previously been diagnosed with chronic active Hepatitis C but elected not to proceed with treatment for it (Tr. 169). She complained of problems with her elbow, hand, and knee joints but indicated that her symptoms were alleviated with Medrol dosepak (Tr. 169). Dr. Gay observed mild synovitis in her hands but not in her wrists, elbows, knees, or ankles (Tr. 169). He assessed a mild case of inflammatory arthritis (Tr. 169). Frederica Nanni, M.D., wrote a letter to Plaintiff's employer on January 29, 2003, indicating that Plaintiff had been diagnosed with rheumatoid arthritis that caused severe pain and fatigue (Tr. 135). She indicated that her medications tended to cause drowsiness (Tr. 135).

In March 2003, Plaintiff returned to Dr. Gay and continued to report symptoms in her hands and wrist and discomfort in her shoulders (Tr. 168). The doctor noted synovitis in her hands, tenderness in her wrists, and difficulty with range of motion in her shoulders (Tr. 168). Dr. Gay concluded that Plaintiff did not have a significant amount of synovitis (Tr. 168). Plaintiff reported in April 2003 that she had dropped out of her college classes (Tr. 131). She described pain in her shoulders and arms (Tr. 131). Her hands were not red but her joints were swollen and tender (Tr. 131).   In May 2003, Plaintiff experienced a flare up and exhibited stiff movement, a loose fist, and tenderness in her hands and knees (Tr. 130). Plaintiff told Dr. Gay in June 2003 that she had less drowsiness while on Plaquenil and more energy (Tr. 167). She had less difficulty with her hands but had discomfort in her shoulders and knees (Tr. 167). Dr. Gay noted mild synovitis in her hands and right wrist but not in her left wrist, elbows, knees, or ankles (Tr. 167).

Plaintiff presented to Bobby Kearney, M.D., of Statesville Pain Associates, on July 17, 2003 (Tr. 161). She reported that a combination of Duragesic and Vicoprofen helped her (Tr. 161). She described pain in her feet, knees, hips, shoulders, elbows, wrists, and hands (Tr. 161). Plaintiff denied any weakness or numbness (Tr. 161).   Plaintiff indicated that she slept

4

throughout the day but was up for nine hours a day (Tr. 161). Dr. Kearney noted tenderness in her cervical joint and hands and good range of motions in her cervical spine, elbows, feet, ankles, knees, and hips (Tr. 162). She exhibited full motor strength (Tr. 162). He prescribed Duragesic, Lexapro, and Provigil (Tr. 162).

Plaintiff returned to Dr. Kearney on August 15, 2003, when she reported that Duragesic worked fairly well for her and that she did well with Lexapro and Provigil for her depression and fatigue (Tr. 160). On August 28, 2003, Dr. Gay examined Plaintiff and indicated that she suffered from a relatively mild case of inflammatory arthritis (Tr. 166). Plaintiff admitted that she slept much less during the day with Provigil (Tr. 166). She reported arthralgias in her shoulders and knees (Tr. 166). The doctor indicated that bony enlargements had developed in her hands but she had no synovitis in her wrists, elbows, knees, or ankles (Tr. 166). She exhibited a decreased active range of motion in her shoulders (Tr. 166). Plaintiff declined an injection for her shoulders (Tr. 166).

Venezela Thomas-Slade, M.D., of Lexington Center for Family Health, examined Plaintiff on September 18, 2003, when she reported chronic pain in her wrists (Tr. 187). Dr. Thomas-Slade found that Plaintiff's systems were negative except for some decreased mobility in her hands secondary to stiffness and mild swelling (Tr. 187). She exhibited a full range of motion in all her joints and had no motor or sensory deficits (Tr. 187). Plaintiff returned to Dr. Kearney on October 15, 2003, when she complained of pain in her shoulders down to her hands (Tr. 159). Dr. Kearney continued Duragesic and Provigil but switched Lexapro to Skelex and added Morphine (Tr. 159).

On December, 31, 2003, after Plaintiff's alleged onset date, Dr. Gay examined Plaintiff and noted no synovitis in her fingers, wrists, elbows, knees, and ankles (Tr. 164). She reported pain in her hands, elbows, and shoulders and prolonged stiffness in her knees but she had felt better recently (Tr. 163). Plaintiff exhibited stiffness in the range of motion of her shoulders (Tr. 164). Plaintiff's "ALT" and "AST" levels were mildly elevated but had not worsened and there was no evidence of systemic inflammation with her normal

"CRP" level (Tr. 173).

Plaintiff returned to Dr. Thomas-Slade on January 15, 2004, and reported that she had stopped taking her Plaquenil for a week but restarted it because her pain symptoms worsened (Tr. 186). Plaintiff worked nights and was afraid to take her Plaquenil after working because she did not want to stay awake (Tr. 186). A review of her systems was negative (Tr. 186). X-rays of her knees and hands in March 2004 were unremarkable (Tr. 191-194).

Seyed Zarabadi, D.O., met with Plaintiff on May [18], 2004, when she reported that she did not want medication for Hepatitis C (Tr. 188). She was in no apparent distress but exhibited tenderness in her hands without any swelling (Tr. 188). Dr. Zarabadi noted that rheumatoid factors were not reliable in Hepatitis C patients since it could be a false positive and Hepatitis C could give arthritis similar to rheumatoid without being erosive (Tr. 188). X-rays showed no erosion (Tr. 188). The available treatment for arthritis was limited because of her Hepatitis C (Tr. 188).

Eddy Duncan, M.D., of West Florida Pain Treatment Centers, treated Plaintiff on June 8, 2004 (Tr. 220). She reported muscle, joint, and bone pain in her arms, feet, hands, and legs but denied pain in her hips, neck, and shoulders (Tr. 220). Plaintiff slept nine hours a night (Tr. 221). Dr. Duncan noted that Plaintiff did not appear in acute distress and had normal muscle tone, gait, station, and reflexes (Tr. 221). He observed tenderness in her hand (Tr. 221). Paraspinal spasms were present in her back but straight leg raising was negative (Tr. 221). On June 30, 2004, Dr. Devito of Genesis Family Physicians completed a form indicating that Plaintiff suffered from a mental impairment that significantly interfered with her daily functioning (Tr. 198). She had been prescribed Lexapro but had not been referred for psychiatric or psychological help (Tr. 198).

Plaintiff returned to Dr. Duncan on July 7, 2004, when she reported problems with her right hand and knees (Tr. 219). Plaintiff denied side effects such as drowsiness or constipation that were unmanageable (Tr. 219). She benefitted from her medication and increased her ability to perform activities of

daily living (Tr. 219).

On July 23, 2004, Linda Appenfeldt, Ph.D., performed a consultative mental evaluation (Tr. 199). Dr. Appenfeldt noted that Plaintiff's gait, station, and ambulation was essentially unremarkable and that she ambulated without the use of an assistive device (Tr. 199). Plaintiff did not display any visible or audible evidence of pain during the evaluation although she reported pain (Tr. 199). She rated her pain as a seven out of ten and the doctor indicated that there was an apparent mismatch between her stated score and clinical presentation (Tr. 199). Plaintiff had a tendency to redirect her responses toward her limitations (Tr. 199). Plaintiff grocery shopped, was able to cook, and traveled to Bradenton, Florida to visit her mother 20 times a month (Tr. 200). [3] The doctor diagnosed nicotine dependence and adjustment disorder with depressed mood (Tr. 201).

Dr. Duncan completed a form on August 11, 2004, indicating that Plaintiff exhibited no swelling or redness in her hands but they were tender and warm (Tr. 218). Her grip was 4/5 bilaterally and her manual dexterity was intact (Tr. 218). Plaintiff retained the ability to button buttons and zip zippers (Tr. 218). She had a mild antalgic gait and walked unassisted (Tr. 218). Plaintiff walked with a cane but the cane was not necessary (Tr. 218, 217). Plaintiff had active synovitis at the doctor's last examination (Tr. 217).

Plaintiff was treated by Nina Pearlmutter, M.D., and Wayne Riskin, M.D., between October 2004 and December 2004 (Tr. 252, 296). Plaintiff reported knee, shoulder, and left hand pain (Tr. 252, 299). Reviews of her systems in November and December were negative (Tr. 249, 246). In December 2004, Dr. Riskin noted that Plaintiff's physical examination was totally within normal limits with the exception of exogenous obesity (Tr. 298). She had a normal general medical examination and negative detailed musculoskeletal examination (Tr. 298). X-rays of her hands and knees were normal (Tr. 298). The doctor noted that Plaintiff's arthralgias

---

[3] From a review of the record, the undersigned believes that Claimant was living in the general area of Bradenton, Florida, at the time she disclosed the visits to her mother. Tr. 199-200, 311.

could be explained on the "basis of a Hepatitis C arthralgia/arthritis rather than in a rheumatoid" (Tr. 298). Plaintiff's reflexes, sensations, and motor strength were within normal limits and she had no active synovitis (Tr. 296).

Anthony Paglia, M.D., of Atlantic Pain Management Specialists, saw Plaintiff on December 14, 2004 (Tr. 311). She complained of pain in her shoulders, elbows, hands, knees, and ankles (Tr. 311). She admitted that Duragesic and morphine sulfate immediate release tablets provided fair pain control and she denied upper and lower extremity weakness (Tr. 311). Plaintiff indicated that she suffered from a loss of sleep (Tr. 312). She exhibited a good passive range of motion through her shoulder, elbow, wrist, hip, knee, and ankle joints (Tr. 312-313). Dr. Paglia noted a minimal arthritic deformity in her fingers, mild guarding of her shoulder with movement, and tenderness in her shoulder and wrist (Tr. 312). There was minimal swelling, tenderness, and some mild crepitus at her knees (Tr. 313). She had full strength (Tr. 313). The doctor assessed chronic polyarthralgic and myalgic pain syndrome secondary to rheumatoid arthritis and osteoarthritis pain syndrome and chronic opioid dependency (Tr. 313).

Dr. Paglia treated Plaintiff again on December 28, 2004, and January 11, 2005 (Tr. 310, 309). Her sleep was fair and improved (Tr. 310, 309). She denied any side effects (Tr. 309). Her pain improved 90 percent with Avenza and her exercise tolerance improved (Tr. 309). Plaintiff was advised to continue her exercise program (Tr. 309).

On January 12, 2005, Plaintiff reported to Dr. Riskin that her generalized pain had increased and that she had extreme exhaustion (Tr. 292). Neurologically, she was within normal limits and had no synovitis (Tr. 293). Plaintiff returned to Dr. Paglia on February 22, 2005, and March 22, 2005, when her sleep had improved and she had no side effects (Tr. 308, 307). She admitted improvement in her pain in February 2005 but had occasional episodes of severe pain (Tr. 308). In March 2005, Plaintiff reported increased generalized pain and hand swelling (Tr. 307).

On April 1, 2005, Dr. Riskin completed a form indicating that

8

Plaintiff suffered from rheumatoid arthritis and Hepatitis C (Tr. 284). This was reflected in Plaintiff's positive rheumatoid factor (Tr. 285). He indicated that the side effects from narcotics included confusion, fatigue, and drowsiness (Tr. 285). The doctor opined that Plaintiff's pain was severe and consistent with objective findings (Tr. 286). Plaintiff was unable to do "sedentary" or "light" work (Tr. 288). She could sit and stand/walk for less than one hour each; occasionally lift 10 pounds; and could perform simple grasping, arm control, and fine manipulation with either hand on a sustained basis (Tr. [289-]290). Because of her narcotics, she was unable to function for extended periods of time (Tr. 290). She needed to lie down for substantial periods of time during the day (Tr. 290).

The next day, Dr. Paglia completed a form indicating that Plaintiff had a positive rheumatoid factor, a decreased passive range of motion and mild swelling in her hand, and increased liver enzymes (Tr. 304). Her medication side effects included nausea, constipation, sedation, cognitive and motor impairment, and gastrointestinal distress (Tr. 304). Plaintiff's pain was moderate to severe (Tr. 305). The doctor noted that Plaintiff had improved pain control with exercise tolerance (Tr. 305).

Later in April 2005, Drs. Riskin and Paglia examined Plaintiff again (Tr. 283, 302). Dr. Riskin noted that Plaintiff was neurologically and musculoskeletally normal and had no active synovitis (Tr. 283). Dr. Paglia indicated that Plaintiff's sleep was fair and she had no side effects (Tr. 302). Plaintiff reported decreased left knee pain but increased tenderness and swelling (Tr. 302).

Plaintiff testified at the administrative hearing on September 28, 2005 (Tr. [339]). Plaintiff amended her alleged onset date to December 15, 2003 (Tr. 342). She lived with a friend and her mother (Tr. 345). She last worked in December 2003 as a security person (Tr. 345). Her job including making rounds, responding to emergency calls, and delivering bills (Tr. 346). She stopped working because it became more difficult and she could not physically do it because of exhaustion from rheumatoid arthritis (Tr. 346).

Plaintiff hurt everywhere including her feet, knees, hands, elbows, wrists, shoulders, and jaw (Tr. 347). She was being treated by Drs. Paglia, Riskin, and Pearlmutter (Tr. 347). She took Plaquenil as an immune system suppressant and Avenza and Morphine for pain (Tr. 348). Plaquenil allowed her to do some things but not a lot and she got some relief from her pain (Tr. 348). Plaintiff used a wrap on her right hand to prevent pain (Tr. 349). Plaintiff reported that Dr. Gay prescribed a cane for her (Tr. 350).

Plaintiff indicated that she could sit for half an hour, stand for 10 minutes, and walk half a block (Tr. 351). Plaintiff said that she spent 14 to 18 hours a day in bed (Tr. 353). Her friend and mother did the shopping, cooking, and household chores (Tr. [352]). Plaintiff tried to take care of her cat (Tr. 352). Plaintiff stopped driving because her doctor's [sic] did not think it was a good idea because she was unable to grip the steering wheel (Tr. 352). She spent her day sleeping, watching television, and reading (Tr. 353).

Commissioner's Motion at 2-10 (DE 15).

## IV.   STANDARD OF REVIEW[4]

In reviewing claims brought under the Social Security Act, the court's role is a limited one. The Commissioner's findings of fact must be affirmed if they are based upon "substantial evidence." Richardson v. Perales, 402 U.S. 389, 401 (1971); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). "Substantial evidence" is evidence that a reasonable person would accept as adequate to support the challenged conclusion. Perales, 402 U.S. at 401; Walden v. Schweiker, 672 F.2d 835, 839 (11th Cir. 1982). The

---

[4] The SSI disability regulations appear in Subsection I of 20 C.F.R. Part 416, 20 C.F.R. § 416.901 et seq., and are generally identical to those set forth in 20 C.F.R. Part 404, Subsection P, 20 C.F.R. § 404.1501 et seq., governing Social Security disability determinations. The standard of review in SSI cases is the same as the standard for Social Security disability cases. 42 U.S.C. § 1383(c)(3). Consequently, the case law addressing Social Security disability determinations is generally applicable to SSI cases.

court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." Bloodsworth, 703 F.2d at 1239. In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, the court must determine whether the ALJ properly applied the correct legal standards. Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).

V.   ANALYSIS

A.   The Sequential Evaluation

A "disability" is defined as an inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can
> be expected to last for a continuous period of not less than 12
> months.

42 U.S.C. § 1382c(a)(3)(A). In determining the merits of a claim for benefits, courts must consider the evidence as a whole, including: 1) objective medical facts or clinical findings; 2) diagnoses of examining physicians; 3) subjective evidence of pain and disability as testified to by the claimant and corroborated by other witnesses; and 4) the claimant's age, education, and work history. Walden, 672 F.2d at 839.

To arrive at a determination as to disability, the ALJ must undertake the sequential evaluation embodied in 20 C.F.R. §§ 404.1520 and 416.920. This process requires that the ALJ first determine whether the claimant is presently engaged in substantial gainful employment. 20 C.F.R. §§ 404.1520(b), 416.920(b). If so, a finding of "no disability" is made.

If the claimant is not engaged in such work, then the ALJ must proceed to the

11

second step and determine whether the claimant suffers from a "severe impairment." An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). If a severe impairment is not found, then the ALJ will conclude that there is no disability; if a severe impairment is found, then the ALJ will proceed to the next phase of the analysis. Id.

The third step requires the ALJ to determine whether the claimant's impairment meets or equals those listed in Appendix I of the Regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the ALJ will find the claimant disabled without considering age, education, and work experience. If not, the inquiry will proceed to the next stage.

Step four requires the ALJ to determine whether the claimant has the "residual functional capacity" to perform past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). The Regulations define "residual functional capacity" as "what you can still do despite your limitations." 20 C.F.R. §§ 404.1545, 416.945. This determination takes into account "all relevant evidence," including the medical evidence, the claimant's own testimony, and the observations of others. Id. The ALJ must then compare the residual functional capacity to the demands of the previous employment to determine whether the claimant is still capable of performing that kind of work. If so, the claimant is found not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f).

If the claimant establishes an inability to return to past relevant work, the burden shifts to the Commissioner to demonstrate that there exists other substantial gainful employment in the national economy that the claimant can perform. Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); Smith v. Schweiker, 646 F.2d 1075, 1077 (5th Cir. Unit

12

A 1981). If the Commissioner points to possible alternative employment, then the burden returns to the claimant to prove an inability to perform those jobs. Smith, 646 F.2d at 1077. These shifting burdens comprise the fifth and final step, at which point the ALJ must resolve whether the claimant is actually capable of performing other gainful and substantial work within the economy.   20 C.F.R. §§ 404.1520(g), 416.920(g).

To help evaluate whether there exist sufficient jobs that can be performed given the claimant's age, education, and physical limitations, the Commissioner has promulgated Medical Vocational Guidelines. See 20 C.F.R. § 404, Subpt. P, App. 2. The Guidelines may be applied where a claimant is not performing substantial gainful activity and is prevented by a severe, medically determinable impairment from doing past relevant work. 20 C.F.R. §§ 404.1569, 416.969. The Guidelines are composed of detailed grids and rules, which, based on a claimant's residual functional capacity, age, education, and previous work experience, direct a finding of disabled or not disabled. See Walker, 826 F.2d at 1002.

Yet, the Guidelines "do not cover all possible variations of factors" and are inapplicable "if one of the findings of fact about the person's vocational factors and residual functional capacity is not the same as the corresponding criterion of the rule." 20 C.F.R. §§ 404.1569, 416.969. The Guidelines, therefore, are generally not applicable where the claimant is unable to "perform the full range of work required of that category on a daily basis." Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991). Further, they may not be used when the claimant suffers from (significant) non-exertional limitations, such as (significant) mental impairments. Id.; Walker, 826 F.2d at 1003. When the

13

Guidelines may not be conclusively applied, they may serve only as a framework to determine whether sufficient jobs exist within the claimant's range of residual functional capacity. Hargis, 945 F.2d at 1490. In such instances, the Commissioner must instead carry his burden through the use of a vocational expert. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989); Walker, 826 F.2d at 1003. A vocational expert provides the ALJ with a realistic appraisal of the work a claimant is capable of performing. Walker, 889 F.2d at 50.

### B.      Application of the Sequential Evaluation by the ALJ

After considering all of the evidence, the ALJ concluded that Claimant was capable of returning to her past relevant work and was, therefore, "not disabled" under the Social Security Act. Tr. 25.

In arriving at this conclusion, the ALJ addressed each step in the evaluative sequence.[5] He first observed that Claimant has not engaged in substantial gainful activity since her alleged onset of disability. Tr. 20, 25. The ALJ next found that Claimant suffers from the following "severe" impairments: "rheumatoid arthritis and osteoarthritis."[6] Tr. 21, 25. Additionally, the ALJ found that Claimant's impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. Tr.

---

[5] Preliminarily, with respect to DIB, the ALJ noted that that Claimant "has earned sufficient quarters of coverage to remain insured through March 31, 2009." Tr. 19. And to receive SSI benefits, Claimant need only establish disability while her application is pending. See 42 U.S.C. § 1382c; 20 C.F.R. §§ 416.330 and 416.335. Eligibility for DIB and SSI benefits, therefore, is not at issue in this matter.

[6] The ALJ also found that Claimant did not have a severe mental impairment, despite Claimant's allegation that she suffers from depression. Tr. 21.

14

21, 23, 25.

The ALJ then assessed Claimant's residual functional capacity. As part of this assessment, the ALJ considered all the evidence, including Claimant's subjective complaints; however, the ALJ found that Claimant's subjective complaints were "not credible as to inability to perform any work." Tr. 24. Then, after considering the entire record, including medical evidence, the ALJ found that Claimant retained the residual functional capacity for "medium level work."[7] Tr. 25. According to the ALJ:

> [C]laimant can lift/carry up to 50 pounds occasionally and 25 pounds frequently, can stand/walk about 6 hours out of an 8 hour day and can sit about 6 hours out of an 8 hour day with occasional limitations in climbing of ladders, ropes, scaffolds, crouching, and crawling.

Tr. 23, 25.

After finding that Claimant's could perform "medium work," the ALJ next considered whether she could still "perform any of her past relevant work." Tr. 24. The ALJ noted that Claimant's past employment as a security guard did not require work related activities that were precluded by her residual functional capacity. R. 24, 25. Accordingly, the ALJ found that Claimant can "return to her past relevant work as a security guard," and he concluded that Claimant is "not under a 'disability,' as defined in the Social Security Act, at any time through the date of this decision . . . ." Tr. 24, 25.

---

[7] The Code of Federal Regulations defines "medium work": "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 416.967(c).

15

C.    Discussion

Claimant disputes the findings and conclusions of the ALJ.  Claimant argues that the ALJ erred in the following respects:  1) he failed to consider the side-effects of the narcotic medications;  2) he failed to accord great weight to the opinion of a treating physician and instead accorded weight to the opinions of non-examining physicians; 3) he failed to recognize that Claimant could not perform any work.  See Claimant's Motion 14-20 (DE 12).  The undersigned, however, does not find Claimant's arguments persuasive and addresses each one as part of the discussion below.

1.    Claimant's Subjective Complaints

Implicit in Claimant's argument that the ALJ failed to properly consider the side-effects of her medications is the argument that the ALJ failed to properly credit her subjective complaints.  See Claimant's Motion at 18-19 (DE 12).  Here, the ALJ expressly discounted her subjective complaints, finding that they are "not credible as to [the] inability to perform any work."  Tr. 24.  The ALJ based this finding on evidence showing that her impairments were controlled by medication and on inconsistencies between her complaints and her daily activities and the ALJ's personal observations.  After reviewing the record, the undersigned finds that the ALJ's articulated legally sufficient reasons to support his assessment.

The ALJ's assessment of subjective complaints is governed by 42 U.S.C. § 423(d)(5)(A), which states in part:

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings,

16

> established by medically acceptable clinical or laboratory
> diagnostic techniques, which show the existence of a medical
> impairment . . . which could reasonably be expected to
> produce the pain or other symptoms alleged and which, when
> considered with all evidence . . . would lead to a conclusion
> that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A). The Eleventh Circuit has stated that an individual alleging

disabling pain must show not only evidence of an underlying medical condition, but also

either "objective medical evidence that confirms the severity of the alleged pain arising

from that condition or . . . that the objectively determined medical condition is of such a

severity that it can reasonably be expected to give rise to the alleged pain." Landry v.

Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986) (citing Hand v. Heckler, 761 F.2d 1545,

1548 (11th Cir. 1985)). "Th[is] standard also applies to complaints of subjective conditions

other than pain." Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). When this

standard is met, the ALJ must then consider a claimant's subjective complaints. Foote v.

Chater, 67 F.3d 1553, 1560-61 (11th Cir. 1995). The ALJ, however, is not required to

credit those complaints. Id. He may discount them provided he "articulate[s] explicit and

adequate reasons for doing so." Id. at 1561-62. The ultimate issue is not whether

Claimant has some pain and limitations, but whether Claimant is credible to the extent that

her pain and limitations prevent her from performing any kind of work. See Clark v.

Chater, 75 F.3d 414, 417 (8th Cir. 1996).

The record here is replete with notations that Claimant's medications improved her

condition; some medication decreased her pain, and other medication made her less

drowsy and gave her more energy. Tr. 139, 143, 160, 161, 166, 167, 171, 186, 219, 308,

309, 311, 348. For instance, on July 7, 2004, Dr. Duncan (pain specialist) wrote that Claimant "benefits from the medications through a reduced amount of pain allowing an increased ability to perform activities of daily living." Tr. 219. He further noted that Claimant "does not have any side effects [from the pain medication] such as drowsiness or constipation that are unmanageable." Tr. 219. Similarly, Dr. Paglia (pain specialist) noted that Claimant's pain improved with medication, and he twice noted that Claimant had no side-effects from the medications. Tr. 186, 308, 309. The Eleventh Circuit has noted that "[a] medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (quoting Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir 1987)). Furthermore, although Drs. Riskin and Paglia did list side effects from medication in their assessments (only), Claimant repeatedly denied (or failed to complain of) any side effects from her medication. Tr. 219, 302, 307, 308, 309. Hence, the ALJ did not err in assessing the effects of Claimant's medications.

The record here also contains evidence of daily activities that belie Claimant's contention that her impairment and medications preclude her from performing any work. Claimant told the ALJ that her friend and her mother did the shopping and cooking and that she no longer drove. Tr. 352. She also stated that she lies in bed for 14 to 18 hours a day. Tr. 353. Yet, the medical records show that Claimant was able to grocery shop, cook, and visit her mother in Bradenton, Florida, twenty (20) times a month to spend the

night.[8]  Tr. 22, 111, 200.  Claimant also took care of her cat, dusted, picked up after

herself, sat outside, read, talked on the phone, watched television, vacuumed, did some

laundry, visited relatives, cared for potted flowers, and went to church weekly.  Tr. 77, 94-

95, 112, 352.  And, contrary to her allegations of sleeping 14 to 18 hours a day, she

complained to Dr. Paglia of a loss of sleep and later told him that her sleep had improved.

Tr. 308-309, 312.  Further, contrary to Claimant's September 2005 hearing testimony that

she "gave up [her] car two years ago," Dr. Duncan noted in June 2004 that "[t]he patient

drives an automatic transmission."  Tr. 221, 352.  An ALJ may properly consider such

activities of daily living when evaluating subjective complaints.  See Macia v. Bowen, 829

F.2d 1009, 1012 (11th Cir. 1987).

     The ALJ's personal observations also factored into his assessment of Claimant's

subjective complaints.  The ALJ noted that Claimant "has a walking stick although he is not

sure she needs it."  Tr. 24.  Similarly, Dr. Duncan had indicated that the cane was not

medically necessary, and Dr. Appenfeldt even noted that Claimant ambulated without any

assistive device.  Tr. 199, 217.  The ALJ further noted that "Claimant can stretch out her

hands and make a fist" and that "[h]er hands do not look bad – it is very slight if at all."  Tr.

24.  An ALJ may properly "consider his or her own recorded observations of the individual

as part of the overall evaluation of the credibility of the individual's statements."  SSR 96-

7p, 1996 WL 374186, at *5 (July 2, 1996).

     Finally, the undersigned notes that the ALJ properly considered the observations

---

[8] The record suggests that Claimant was living in the general area of Bradenton, not in South Florida, at the time she disclosed the frequent trips to her mother's home.  Tr. 199.

of the psychological examiner, Dr. Linda Appenfeldt. Tr. 22. See 20 C.F.R. §§ 404.1529, 416.929 (all evidence considered when evaluating claimant's alleged symptoms). Dr. Appenfeldt had observed that there was "an apparent mismatch between the [C]laimant's stated score and clinical presentation"; Claimant's reported pain level of seven out of ten was inconsistent with her lack of visible or audible evidence of pain. Tr. 22, 199. Dr. Appenfeldt also observed that Claimant's gait was unremarkable and that she ambulated without an assistive device, contrary to Claimant's contention that she needed a cane. Tr. 22, 199. Dr. Appenfeldt had also observed that Claimant had a tendency to redirect her responses toward her limitations. Tr. 199. Finally, Claimant had reported to Dr. Appenfeldt that she engaged in daily activities – including shopping, cooking, and frequent travel (20 times per month) to Bradenton to visit her mother – that were inconsistent with her hearing testimony.[9] Tr. 22, 200, 352-53.

The ALJ articulated adequate grounds upon which to discount Claimant's subjective complaints – successful treatment with pain medication, daily activities, and personal observations. Although the ALJ did find that Claimant has "some limitations," he rejected Claimant's contentions that those limitations leave her unable "to perform any work." Tr. 24. Where an ALJ clearly articulates a credibility finding with substantial supporting evidence, as the ALJ did here, a reviewing court may not disturb such a finding. See Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995).

---

[9] The undersigned notes that Claimant appears to have concealed important information from the psychologist. Claimant told Dr. Appenfeldt that she had never utilized illicit substances; yet, she had previously disclosed to Dr. Carson a history of IV drug use. Tr. 169, 200.

## 2.    The Physicians' Opinions

Claimant states that the ALJ erred by "not according great weight to the opinion of

Dr. Riskin, the Claimant's treating rheumatologist and by according weight to the opinions

of the non-examining physicians." Claimant's Motion at 14 (DE 12). Dr. Riskin had opined

that Claimant could not perform even sedentary work, while the State Agency physicians

had opined that Claimant could perform medium work. Tr. 224, 276, 288. A review of the

ALJ's written decision sheds light on the weight that he actually accorded the various

physician opinions: he gave "significant weight" to the opinions of Dr. Appenfeldt, Dr.

Paglia, Dr. Duncan, and Dr. Gay; he gave "some weight" to the opinions of the State

Agency medical consultants; and he gave "less weight to the opinion of Dr. Riskin . . . as

it [was] not substantiated by the other evidence in the record." Tr. 23, 24.

The Regulations do require that an ALJ give more weight to the opinion of a treating

source. See 20 C.F.R. § 404.1527(d)(2). The ALJ must accord a treating source opinion

controlling weight where it is supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with other substantial evidence in the record.

Id. When controlling weight is not accorded the opinion, the ALJ must consider the

specialization of the physician, the length of the treatment relationship, the nature and

frequency of the examinations, the evidence offered in support of the opinion, and the

consistency of that opinion with the record as a whole. 20 C.F.R. § 404. 1527(d). An ALJ,

however, may discount a treating source's opinion when "good cause exists for not

heeding the treating physician's diagnosis," including instances when the opinion is not

accompanied by objective evidence or is merely conclusory. Edward v. Sullivan, 937 F.2d

21

580, 583 (11th Cir. 1991).

The ALJ noted that Dr. Riskin had completed a Physical Capacities Evaluation, noting that Claimant was unable to perform even sedentary work: she could sit less than one hour, stand/walk less than one hour, occasionally lift up to ten pounds, and was unable to function for extended periods of time due to chronic narcotic medication use. Tr. 23, 288-290. Dr. Riskin rendered this opinion on April 1, 2005. Tr. 283-87. At that time, however, Dr. Riskin had only seen Claimant on three occasions, and he had last seen her approximately two months earlier. Tr. 292, 295, 299. This disclosure calls into question whether Dr. Riskin had the type of "on-going treatment relationship" with Claimant that would render him a "treating source." See 20 C.F.R. §§ 404.1502, 416.902.[10] Moreover, Dr. Riskin's own findings do not support his determination that Claimant could not perform any work or that she suffered disabling side-effects from her medication. In his notes, Dr. Riskin had written that Claimant's physical examination "was totally within normal limits." Tr. 298. He had also written that Claimant "had a normal general medical

---

[10] According to the Regulations:

> Treating source means [a claimant's] own physician, psychologist, or other acceptable medical source who provides [a claimant], or has provided [a claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [a claimant]. [An ongoing treatment relationship results ] when the medical evidence establishes that [a claimant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [a claimant's] medical condition(s).

20 C.F.R. §§ 404.1502, 416.902

22

examination" and that she had a "negative detailed musculoskeletal examination." Tr. 298. X-rays of her hands and knees were "normal." Tr. 298. Dr. Riskin had also noted normal reflexes, sensations, and motor strength and no active synovitis. Tr. 283, 292, 296. In addition, Dr. Riskin indicated that Claimant retained the ability for simple grasping, arm control, and fine manipulation.[11] Tr. 290. Although some of Dr. Riskin's hand-written notes are difficult to read, the undersigned was not able to locate any reference in those notes to the disabling medication side-effects that he claimed in his Physical Capacities Evaluation. Dr. Riskin's medical records, therefore, undercut his opinion that Claimant was unable to perform any work.

Furthermore, Dr. Riskin's opinion is also contradicted by the other medical records and other physicians in this case. The undersigned notes that Claimant's x-rays of her hands and knees were unremarkable. Tr. 191-194. The undersigned further notes that Dr. Gay found only mild synovitis in her hands and none in her elbows and knees. Tr. 164, 166-169, 171. In January 2003 and, again, in August 2003, he diagnosed "a mild case of inflammatory arthritis." Tr. 166, 169. Dr. Paglia noted "minimal" arthritic deformity in her hands, and he noted no side-effects. Tr. 302, 307-309, 312. Drs. Thomas-Slade and Perlmutter's physical examinations were negative, and Dr. Pearlmutter noted that Claimant was swimming. Tr. 186, 246, 249. Dr. Duncan noted that Claimant's muscle tone, gait, station, and reflexes were normal and that she did "not have any side effects such as drowsiness or constipation that are unmanageable." Tr. 219, 221.

---

[11] The undersigned notes that this finding by Dr. Riskin is consistent with the ALJ's personal observation that Claimant's hands did not appear to him to be that bad.

Claimant faults the ALJ for "according weight" to the opinions of the State Agency physicians. Claimant's Motion at 14 (DE 12). Indeed, Claimant argues that "[i]nstead of according proper weight to Dr. Riskin's opinion, the ALJ based his RFC opinion upon the opinions made by the non-examining physicians at the state agency levels." Id. at 17. A closer reading of the ALJ's decision, however, reveals not that the ALJ "based" his opinion upon those of the State Agency physicians, but only that he accorded "some weight" to their opinions; indeed, he acknowledged that they "are entitled to less weight as they were provided by a non-examining physician." Tr. 24. The State Agency physicians had opined in August 2004 and in January 2005 that Claimant retained the capacity to perform medium work.[12] Tr. 224, 276. The Regulations state that agency physicians are "highly

---

[12] In addition to rendering assessments showing that Claimant could perform medium work, the State Agency physicians detailed the facts upon which they based their respective conclusions. On August 23, 2004, Dr. Thomas Renny wrote:

> TS [treating source] reports non erosive rheumatoid arthritis without systemic manifestations or severe joint morbidity, the 6/04 exam does not show severe synovitis or subluxations and the recent x-rays are not reported as significant medical problems. Hand joint tenderness and spinal muscle spasm is reported but the SLR is reported as normal. TS reports possible early onset R.A. [rheumatoid arthritis] without an acute flare at the time of the most recent exams. Notes show that the TS opines that a cane is not needed for ambulation.

Tr. 224. And on January 28, 2005, Dr. Caroline L. Moore wrote:

> 40 yo female has a h/o non erosive RA [rheumatoid arthritis] w/out any systemic manifestations or severe joint morbidity. 6/04 PE showed no significant synovitis or subluxations; PVMS however (-) SLR. TS [treating source] reports probable early onset RA w/out an acute flare up at the time of the most recent exams. 1/25/05 exam showed wt 233 # VSS general exam nl. No motor, sensory or DTR deficits. No evidence of

qualified physicians . . . who are also experts in Social Security disability evaluation." 20 C.F.R. § 404. 1527(f)(2)(i). And the Regulations require that the ALJ consider the findings of state agency physicians as opinion evidence. Id. Here, the ALJ correctly "considered" the opinions of the State Agency physicians, which opinions were well supported by reference to the medical records, and he elected to accord them "some weight" because "they are considered medical opinions." Tr. 24.

In sum, after conducting an independent review of the record, and expressly according "significant weight" to the opinions of Dr. Appenfeldt, Dr. Paglia, Dr. Duncan, and Dr. Gay, the ALJ properly arrived at the his own conclusions, which are consistent with those of the State Agency physicians. See SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996) (an ALJ reviewing the findings of State Agency physicians must consider factors such "as the supportability of the opinion in the evidence including . . . the consistency of the opinion with the record as a  whole . . . .").

### 3.    Residual Functional Capacity

Finally, Claimant argues that the ALJ erred in determining that she had a residual functional capacity to perform "medium work." More specifically, after considering all of the evidence, the ALJ found that Claimant "can lift/carry up to 50 pounds occasionally and 25 pounds frequently, can stand/walk about 6 hours out of an 8 hour day and can sit about 6 hours out of an 8 hour day with occasional limitations in climbing of ladders, ropes,

---

synovitis, nodules, tophi, discoid lesions, sclerodactyly, digital ulcers or any other connective tissue s/s.

Tr. 276.

scaffolds, crouching, and crawling." Tr. 23, 25." Claimant, however, proffers the opinion of Dr. Riskin (that she could not perform even sedentary work) to support her contention that the ALJ erred in his residual functional capacity assessment. Yet, as noted above, the ALJ articulated adequate reasons, supported by substantial evidence in the record, for discounting Dr. Riskin's opinion. Given the totality of the evidence in the record, the undersigned concludes that the ALJ had substantial evidence upon which to base his residual functional capacity finding.

After finding that Claimant retained the capacity for medium work, the ALJ considered the requirements of her past relevant work as a security guard. He had noted that her security work required that she patrol the grounds, deliver bills, and take emergency calls. Tr. 24. After comparing these job requirements to her residual functional capacity, the ALJ found that "[C]laimant is able to return to her past relevant work as a security guard" as her "impairment does not prevent [her] from performing" such work. Tr. 24, 25. And after arriving at this finding, the ALJ properly concluded that "[C]laimant was not under a 'disability' as defined in the Social Security Act" and, accordingly, was not entitled to DIB or SSI benefits.[13] Tr. 25-26.

---

[13] The ability to perform medium work subsumes an ability to also perform light and sedentary work. 20 C.F.R. § 416.967(c). The undersigned notes that even if Claimant were capable only of light work or sedentary work, given Claimant's age (younger individual) and education (high school graduate or more), and given that the ALJ had adequate grounds for discounting her subjective complaints, the Medical Vocational Guidelines would direct a finding of "not disabled." See 20 C.F.R. Pt. 404, Subpt. P., App. 2, Rules 201.21, 201.22, 201.27-201.29, 202.16-202.22. Accordingly, even if Claimant's residual functional capacity were reduced to a light or sedentary level, and she were unable to return to her past work, the Guidelines would nonetheless have directed the same result as the ALJ had reached here.

VI.     RECOMMENDATION

Claimant had a fair hearing and full administrative consideration in accordance with the applicable statutes and regulations. The ALJ's findings are supported by substantial evidence in the administrative record. The ALJ, therefore, correctly concluded that Claimant is not entitled to DIB or SSI benefits. Accordingly, the undesigned respectfully RECOMMENDS that Plaintiff's Motion for Summary Judgment (DE 12) be DENIED, that Defendant's Motion for Summary Judgment (DE 15) be GRANTED, and that the Commissioner's decision be AFFIRMED.

The parties will have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable James I. Cohn, United States District Judge. Failure to file objections timely shall bar the parties from a de novo determination by the district court of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district court except upon grounds of plain error or manifest injustice. See 28. U.S.C. § 636(b)(1); Nettles v. Wainwright, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc).

DONE and SUBMITTED at Fort Lauderdale, Florida this 16th day of May 2008.


BARRY S. SELTZER
United States Magistrate Judge

Copies furnished to:

Honorable James I. Cohn
United States District Judge

Lilli W. Marder, Esq.
7000 W. Palmetto Park Road
Suite 111
Boca Raton, Florida 33433
Counsel for Plaintiff Amy S. Jackson

David I. Mellinger, Esq.
Assistant United States Attorney
500 East Broward Boulevard, Suite 700
Fort Lauderdale, Florida 33394

Jeremiah D. Hayes, Esq.
Assistant Regional Counsel
Social Security Administration
601 East 12th Street, Room 535
Kansas City, Missouri 64106